UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Amity Dimock, Trustee for the Heirs and Next of Kin of Kobe Dimock-Heisler,** | Court File No. |
| **Plaintiff,** | |
| vs. | **COMPLAINT WITH JURY DEMAND** |
| **City of Brooklyn Center; Officer Brandon Akers, Officer Steve Holt, Officer Cody Turner, and Officer Joseph Vu, all in their individual and official capacities,** | |
| **Defendants.** | |

## INTRODUCTION

For her Complaint, Amity Dimock, in her capacity as Trustee for the heirs and next of kin of Kobe Dimock-Heisler, states and alleges as follows:

1. By order dated July 22, 2022, Hennepin County District Court appointed Amity Dimock as Trustee for the Heirs and Next of Kin of Kobe Dimock-Heisler.

2. This is an action for money damages arising out of the August 31, 2019 fatal shooting of Kobe Dimock-Heisler which resulted from violations of well-settled federal civil rights and state law.

3. Plaintiffs further assert a claim against City of Brooklyn Center under *Monell v. Department of Social Services*, 436 U.S. 658 (1975), and *Canton v. Harris*, 489 U.S. 378 (1989).

## JURISDICTION AND VENUE

4. This Court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein under the Civil Rights Act of 1871, Title 42, §1983 to redress and enjoin the illegal

1

practices alleged in this Complaint. This Court also has supplemental jurisdiction over plaintiff's state law claims pursuant to Title 28, United States Code, §1367.

5. Venue is proper in the District of Minnesota because Defendant City of Brooklyn Center is located in this district, the other individually named defendants are employed in this district, and the incidents in question occurred in this district.

## PARTIES

6. Plaintiff's decedent, Kobe Dimock-Heisler ("Kobe") was a resident of Brooklyn Center when he died as a result of homicide by Brooklyn Center police on August 31, 2019.

7. Plaintiff Amity Dimock has been appointed Trustee for the heirs and next of kin of Kobe Dimock-Heisler for purposes of commencing this action and was at all material times a resident of the State of Minnesota.

8. Defendant Police Officers Brandon Akers, Steve Holt, Cody Turner, and Joseph Vu, collectively "Defendant Officers," were at all times relevant to this complaint duly appointed and acting officers of the police department of the City of Brooklyn Center, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota and/or the City of Brooklyn Center.

9. The City of Brooklyn Center ("Brooklyn Center" or "The City"), Minnesota, is a municipal corporation and the public employer of the Defendant Officers. Defendant Brooklyn Center is sued directly and also on the theories of respondeat superior or vicarious liability and pursuant to Minn. Stat. § 466.02, for the actions of its officers and officials, including the Defendant Officers.

## FACTS

10. Decedent Kobe Heisler was born with autism, a neurodevelopmental disorder with symptoms that become apparent before the age of three. Despite his disabilities, he was an active member of the Hard Times Bicycle Club, riding tall bikes in the Mayday Parade and other events. He was well known for riding a rickshaw bike each year during National Night Out, giving rides to neighborhood children. He was also known for his skills in gardening, cooking, crocheting and crafting.

11. Kobe lived at 5918 Halifax Avenue North.

12. Kobe lived with his grandfather, Erwin Heisler and his grandmother, Susan Heisler.

13. Kobe was 21 years old when he was shot and killed by Brooklyn Center Officers Brandon Akers and Cody Turner.

14. On August 31st, 2019 Kobe and Erwin argued about problems with a meal from Wendy's, Kobe's favorite restaurant.

15. When Kobe picked up a hammer and a small knife and demanded an apology, Erwin left the room and called 911.

16. After speaking with emergency dispatch, Erwin decided that they would not be helpful, told them to "oh forget it," and disconnected the call.

17. Emergency dispatch called back twice. Erwin answered the second time and said, "He's probably gonna be okay. Just forget it."

18. Emergency dispatch broadcast a call for service over the radio and to squad computers.

19. Officer Brandon Akers responded.

20. Officer Cody Turner responded.

21. Officer Steve Holt and his trainee officer Joseph Vu responded.

22. Officer Sarah Frye responded.

23. On information and belief, all Def. Officers have had at least forty hours of Crisis Intervention Training.

24. Officer Akers looked up prior incidents for the address.

25. Officer Akers noticed an incident in which Kobe stabbed himself in the abdomen in March of 2019 and was hospitalized.

26. Officer Akers let the other officers know about the stabbing incident.

27. Officer Holt looked up prior incidents for the address.

28. After arriving in the area of 5918 Halifax Avenue North, the officers gathered before moving towards the house where Kobe lived.

29. While approaching 5918 Halifax Avenue North, Officer Turner and Akers talked about the prior incident, in which Kobe had stabbed himself.

30. As the officers approached 5918 Halifax Avenue North, Officer Frye went to the back of the house, while the other officers approached the front.

31. The officers approaching the front of the house at 5918 Halifax Avenue North found Erwin waiting on the front steps.

32. Erwin told the officers that Kobe had calmed down and was going to be okay.

33. Officer Akers told Erwin that the officers had to check on everyone in the house.

34. Erwin stepped back into the doorway to show the officers that things were calm.

35. After Erwin stepped back, Kobe and Susan were visible from the door.

36. Erwin did not invite the officers into the house at 5918 Halifax Avenue North.

37. Officer Holt and Trainee Officer Vu squeezed past Erwin to enter the house.

38. Kobe was sitting calmly on the sofa as Holt and Vu entered.

39. Officers did not remove Susan or Kobe from the small living room.

40. Officer Akers asked Erwin to go outside with him.

41. As Officer Akers went outside with Erwin, he told Officer Sarah Frye that they were okay and waved her off.

42. Officer Sarah Frye, a nationally recognized officer in domestic violence situations, left the scene.

43. Erwin explained to Officer Akers that Kobe is autistic, and was very afraid of the police taking him from his home.

44. Officer Turner joined Officer Akers outside with Erwin.

45. Officer Akers did not share the knowledge that Kobe was very afraid of the police taking him from his home with any of the other officers.

46. In the house, Trainee Officer Vue was speaking with Kobe.

47. Trainee Officer Vue stood within two feet of Kobe, asking the same questions repeatedly even after Kobe answered them. This escalated and frustrated Kobe.

48. Kobe told Officer Vue that he knew he would be sent to the hospital, and that Officer Vue did not need to lie to him.

49. Kobe began to cry and say he did not want to go to the hospital.

50. Officer Vue told Kobe he did not know what would happen and that the police just wanted to get Kobe checked out.

51. Kobe attempted to run toward the front door.

52. Officer Holt grabbed Kobe by the waist and threw him into the sofa near the front door. The sofa flipped on its back. Officer Holt rolled toward the front door.

53. Trainee Officer Vue held Kobe by the legs as Kobe was on his back on the sofa.

54. Officers Turner and Akers entered the front door.

55. Officer Turner moved to the end of the sofa furthest from the front door.

56. Officer Akers stood at the end of the sofa nearest the front door.

57. Both Officers Akers and Turner deployed their TASERs.

58. Neither Officer Akers nor Officer Turner gave any warning before activating their TASERs.

59. None of the Officers gave Kobe any command to comply with.

60. Neither Officer Akers nor Officer Turner was far enough from Kobe for their TASER to have a muscular incapacitation effect.

61. Both TASERs were deployed, but were only useful in a pain compliance mode.

62. Both Officers Akers and Turner caused Kobe to experience jolts of electrical pain.

63. Kobe attempted to get off the couch and flee toward the hallway leading to the back door.

64. Trainee Officer Vue grabbed Kobe by the legs, causing Kobe to fall to the floor. Kobe's shorts were pulled down toward his knees.

65. Officer Turner ran past Kobe and attempted to use his TASER in drive/stun mode to inflict further pain on Kobe.

66. Officer Turner missed Kobe and moved toward the exit Kobe was crawling toward.

67. Officer Holt attempted to engage Kobe with his TASER.

68. Trainee Officer Vue let go of Kobe's legs and moved back three to four feet to avoid the TASER.

69. Kobe attempted to crawl away by moving into a position with his left knee, right foot, and right hand on the floor, trying to escape the TASER electric shocks and flee to the back door.

70. Officer Turner yelled, "Knife, knife, knife!"

71. Officer Akers fired his gun.

72. Officer Turner was in the line of Officer Aker's fire.  He stepped back.

73. Officer Akers did not warn Kobe prior to his use of deadly force.

74. Officer Akers did not give a command prior to his use of deadly force.

75. Officer Turner stepped forward, raised his gun and shot Kobe in the head.

76. Officer Turner's gun was within 2 feet of Kobe's head when he fired his gun.

77. Officer Turner did not warn Kobe prior to his use of deadly force.

78. Officer Turner did not give a command prior to his use of deadly force.

79. A paring knife was found near Kobe's body.

### COUNT 1: 42 U.S.C. § 1983 – FOURTH AND/OR FOURTEENTH AMENDMENT EXCESSIVE FORCE AGAINST DEFENDANT OFFICERS AKERS AND TURNER

80. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

81. Based on the factual allegations above, Defendant Officers Akers and Turner, acting under color of law, violated Kobe's Fourth and Fourteenth Amendment rights through their use of excessive force.

82. Kobe's flight from Defendant Officers was a direct result of Defendant Officers repeated use and attempted use of TASERS to inflict pain on him without warning or orders to comply.

83. Kobe had not evidenced a threat to Defendant Officers or others in his attempt to flee.

84. Kobe was not a threat to Defendant Officers with his dominant hand planted on the ground.

85. In spite of the lack of a credible threat to their safety or the safety of others, Officer Turner and Officer Akers shot Kobe repeatedly, resulting in his death.

86.  The use of force by Officer Turner and Officer Akers was excessive and violated Kobe's right to be free from unreasonable seizure in violation of the Fourth Amendment to the Constitution.

87. Plaintiff has suffered pecuniary loss as a result of Kobe's death.

### COUNT 2: 42 U.S.C. § 1983 – FOURTH AND/OR FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE AGAINST OFFICER AKERS

88. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

89. Defendant Officer Akers knew that Kobe was subject to emotional outbursts resulting in self harm.

90. Defendant Officer Akers left Kobe in the charge of a Trainee Officer.

91. Defendant Officer Akers dismissed the specialist in handling domestic situations, Officer Frye.

92. Defendant Officer Akers had received CIT training.

93. Defendant Officer Akers learned that Kobe had a great fear of being taken from his home.

94. Defendant Officer Akers knew that failure to communicate Kobe's fear to the Trainee Officer and the dismissal of the domestic situation expert, Officer Frye, would likely lead to situations resulting in harm to Kobe.

95. Defendant Officer Akers did not communicate Kobe's fear to other officers, did dismiss the domestic situation expert, and did leave Kobe in the hands of a Trainee Officer, precipitating the situation leading to Kobe's death.

96. Defendant Officer Akers acted with deliberate indifference toward Kobe.

97. As a result of Defendant Officer Akers deliberate indifference, Kobe was shot and killed and his family was injured by his loss.

### COUNT 3: 42 U.S.C. § 1983 – FOURTH AMENDMENT UNLAWFUL SEARCH AGAINST OFFICERS HOLT AND VUE

98. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

99. At the time Officer Holt and Trainee Officer Vue squeezed past Erwin, all persons in the house were visible to the Defendant Officers through either the door or living room window.

100. At the time Officer Holt and Trainee Officer Vue squeezed past Erwin, Erwin had not consented to the entry of the Officers.

101. At the time Officer Holt and Trainee Officer Vue squeezed past Erwin, there were no exigent circumstances requiring entry into the home at 5918 Halifax Avenue North.

102. At the time Officer Holt and Trainee Officer Vue squeezed past Erwin, there was no warrant outstanding for the search of the home at 5918 Halifax Avenue North or the arrest of Kobe Heisler.

103. The entry of Officer Holt and Trainee Officer Vue violated Kobe's right to be free from unlawful search and seizure.

104. At the time Trainee Officer Vue searched Kobe, Kobe was not under arrest.

105. Trainee Officer Vue removed Kobe's phone from Kobe's pockets during his search.

106. Trainee Officer Vue's search inside Kobe's pocket, without probable cause of a weapon, violated Kobe's right to be free from unlawful search and seizure.

### COUNT 3: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND THE MINNESOTA HUMAN RIGHTS ACT AGAINST ALL DEFENDANTS

107. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

108. Kobe was diagnosed with autism.

109. Kobe's autism diagnosis was known to Defendants through prior police calls and because Erwin informed them.

110. Kobe was entitled to reasonable policing services as any non-disabled member of Brooklyn Center.

111. Kobe was entitled to accommodation of his disability as necessary.

112. Kobe was excluded from reasonable policing services when Defendants failed to make accommodation for his disability.

113. Defendants' exclusion of Kobe from reasonable policing services violated both the Americans with Disabilities Act 42 U.S.C. §12101 et. Seq. as well as the Minnesota Human Rights Act, Minn. Stat 363A.12

114. As a result of Kobe's exclusion from reasonable policing services, including failure to accommodate his disability, Plaintiff has suffered damages as aforesaid.

### COUNT 4: MINN. STAT. § 573.02 WRONGFUL DEATH AGAINST DEFENDANT OFFICERS AKERS AND TURNER

115. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

116. By reason of Defendants' unlawful conduct described above, Kobe lost his life.

117. Plaintiff is entitled to recover all damages suffered as a result of Kobe's wrongful death.

### COUNT 5: 42 U.S.C. §1983–MONELL LIABILITY AGAINST THE CITY OF BROOKLYN CENTER

118. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

119. Defendant City of Brooklyn Center developed and maintained policies and/or customs, and/or practices through their training regimes, predisposing officers of the police department to use excessive force in the deployment of TASERS when not appropriate or legal.

120. Defendant City of Brooklyn Center developed and maintained policies and/or customs, and/or practices through their training regimes, predisposing officers of the police department to use excessive amounts of deadly force.

121. Defendant City of Brooklyn Center cultivated and maintained policies and/or customs, and/or practices through their training regimes and culture predisposing officers to fire their weapons inappropriately when other officers fired.

122. These policies, customs, practices and lack of training were the cause of the violations of Kobe's Constitutional rights.

123.  As a result of these Constitutional violations, Kobe and his heirs and next of kin suffered damages as aforesaid.

## RELIEF REQUESTED

**WHEREFORE, Plaintiff requests that this Court grant the following relief:**

a.  Issue an order granting Plaintiff's judgment against Defendants, finding that Defendants violated Plaintiff's federally protected Constitutional and statutory rights as well as Plaintiff's common law rights under Minnesota state law;

b.  Award of compensatory damages to Plaintiff against all Defendants, jointly and severally;

c.  Award of punitive damages to Plaintiff, pursuant to *Smith v. Wade*, 461 U.S. 30 (1983);

d.  Award of such other and further relief as this Court may deem appropriate.

**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL.**

Date: August 30, 2022            By /s/ Paul J. Bosman
                                 Paul J. Bosman, #0388865
                                 2136 Ford Parkway, #5328
                                 St. Paul, MN 55116
                                 Tel: (651) 485-7046
                                 paul.bosman@gmail.com

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorneys' and witness fees may be awarded pursuant to Minn. Stat. § 549.211, to the opposing party.

Date: August 30, 2022            By /s/ Paul J. Bosman
                                 Paul J. Bosman, #0388865
                                 2136 Ford Parkway, #5328
                                 St. Paul, MN 55116
                                 Tel: (651) 485-7046
                                 paul.bosman@gmail.com