**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Amity Dimock, *Trustee for the Heirs and*            Civil No. 22-2124 (DWF/DLM)
*Next of Kin of Kobe Dimock-Heisler*,

                    Plaintiff,

                                                                    **MEMORANDUM**
v.                                                                  **OPINION AND ORDER**

City of Brooklyn Center; and Brandon
Akers, Steve Holt, Cody Turner, and
Joseph Vu, *in their individual and official*
*capacities*,

                    Defendants.


**INTRODUCTION**

This matter is before the Court on Defendants City of Brooklyn Center and

Officers Brandon Akers, Steve Holt, Cody Turner, and Joseph Vu's (collectively,

"Defendants") motion for summary judgment.  (Doc. No. 18.)  Plaintiff Amity Dimock

opposes the motion.  (Doc. No. 24.)  For the reasons set forth below, the Court grants

Defendants' motion.

**BACKGROUND**

Erwin Heisler called 911 in August 2019 to report an emergency.  (Doc. No. 21-3

at 00:07-10.)  He reported that his twenty-one-year-old "grandson ha[d] gotten violent"

and had "a hammer and a knife" in his hands.  (*Id.* at 00:16-32.)  The 911 operator asked

Erwin[1] a few clarifying questions regarding the grandson and after a minute on the line, Erwin said "oh, forget it" and hung up the phone.  (*Id.* at 1:27-29.)

Brooklyn Center Police Officers Cody Turner and Brandon Akers responded to the call and arrived at Erwin's house along with Officers Joseph Vu and Steve Holt. (Doc. No. 21-11 ("Holt BWC") at 4:25:33; Doc. No. 21-1 ("Akers BWC") at 4:25:17.) Officer Turner told Officer Akers that he had been at the house around six months ago when someone stabbed themself.  (Akers BWC at 4:25:15-30; Doc. No. 21-7 ("Turner Dep.") at 35.)

As the officers approached the house, Erwin stepped outside.  (Akers BWC at 4:26:13.)  Officer Akers asked Erwin what was going on and Erwin responded, "He's going to be okay."  (*Id.* at 4:26:15-19.)  Officer Akers then asked Erwin who was in the house, and Erwin said that his wife and his grandson were in the house.  (*Id.* at 4:26:20-23.)  Officer Akers told Erwin that they needed to make sure that everyone in the house was alright before they left.  (*Id.* at 4:26:23-26.)  Erwin said, "okay" and then opened the screen door and front door and stepped inside.  (*Id.* at 4:26:26-38.)  As Erwin stepped inside, he appeared to briefly hold open the screen door with his right hand.  (*Id.* at 4:26:36-38; Holt BWC at 4:26:36-38.)  The officers followed Erwin inside.  (Akers BWC at 4:26:38-27:00.)

---

[1]     The Court uses first names to avoid confusion, as the case involves a family who shares the same last name.

Once inside, Officer Akers asked what was going on.  (Akers BWC at 4:26:46-48.)  Erwin's wife, Susan, told him that Erwin and their grandson, Kobe, "had an upset fight." (*Id.* at 4:26:50-58.)  Officer Vu then asked Kobe to stand up so that he could search him for weapons.  (*Id.* at 4:27:03-07.)  Kobe said "alright" and stood up.  (*Id.*)  Kobe let Officer Vu know that he had a phone in his pocket.  (*Id.* at 4:27:07-09.)  As Officer Vu conducted a pat-down search, Erwin told the officers that Kobe did not have any weapons because Kobe "gave [Erwin] what he had." (*Id.* at 4:27:09-12.)  Officer Akers briefly felt between the couch cushions where Kobe had been sitting to feel for any weapons there.  (*Id.* at 4:27:26-29.)

Officer Akers then asked Erwin to step outside and talk with him.  (*Id.* at 4:27:34-37.)  The two spoke for a few minutes while Officers Holt and Vu remained inside with Kobe and Susan.  (*Id.*)  Officer Turner watched both groups from the entryway.  (*Id.* at 4:27:45.)  Outside, Erwin told Officer Akers that Kobe was supposed to be in treatment and was on medication for "upset." (*Id.* at 4:27:54-28:25.)  Erwin explained that Kobe is autistic and was not currently in his treatment program.  (*Id.* at 4:28:02-21.)

Officer Akers asked Erwin to explain what happened that day.  (*Id.* at 4:28:25-26.)  Erwin said that Kobe was upset and had a knife and a hammer.  (*Id.* at 4:28:26-34.)  Erwin also mentioned that Kobe cut himself with a knife on his chest and arms.  (*Id.* at 4:28:40-50.)  Officer Akers relayed that information to Officer Turner who was standing in the entryway of the house.  (*Id.* at 4:28:58-29:03.)  Erwin further mentioned to Officer Akers that Kobe is deathly "afraid of being taken away by the police." (*Id.* at 4:29:25-29.)

3

Erwin told Officer Akers that Kobe was mad because they got the wrong order at Wendy's.  (*Id.* at 4:31:12-47.)  Kobe was upset and jumped out of the car while it was moving and walked home.  (*Id.* at 4:32:03-13.)  When he got home, Kobe was angry and grabbed a knife and hammer and screamed at Erwin that he needed to apologize to him.  (*Id.* at 4:32:45-33:44.)  Erwin went into the bedroom and called the police.  (*Id.* at 4:33:10-15.)  Once Erwin told Kobe that he called the police, Kobe began cutting himself on his chest and arms.  (*Id.* at 4:33:15-32.)

Officer Turner then joined Erwin and Officer Akers outside and told Erwin that he responded to a call in March when Kobe had stabbed himself in the stomach.  (*Id.* at 4:34:32-38.)  Officer Turner told Erwin that Kobe had been very honest when speaking with the other officers inside and admitted to chasing Erwin with a knife and hammer with the intention of assaulting him.  (*Id.* at 4:35:30-42.)  Erwin reiterated that Kobe is afraid of being hospitalized.  (*Id.* at 4:36:55-59.)

Back inside the house, Officers Vu and Holt had a conversation with Kobe.  (Holt BWC at 4:27:47.)  Officer Vu asked Kobe what was going on.  (*Id.* at 4:27:48-50.)  Kobe said that he got mad at his grandfather and pointed knife at him and said, "fucking apologize."  (*Id.* at 4:27:50-28:24.)  Officer Vu then asked Kobe what he planned to do with the knife, and Kobe said, "I don't know, just, probably assaulting him."  (*Id.* at 4:28:28-33.)  Around this time, Officers Vu and Kobe learned from Officer Turner that Kobe had cut himself with the knife and asked him to show them where he cut himself.  (*Id.* at 4:29:07-20.)  He said that he cut himself to get his grandfather to apologize for

4

leaving him at Wendy's.  (*Id.* at 4:32:19-45.)  Kobe said he got the knife from his

bedroom.  (*Id.* at 4:32:58-33:01.)

Officer Vu told Kobe that he called an ambulance to check on his wounds and that

they would figure out how to proceed from there.  (*Id.* at 4:33:30-38.)  Kobe said that he

knew he was going to get committed and they did not have to lie to him about it.  (*Id.* at

4:35:30-37.)  Officer Vu said he would only be evaluated and not necessarily committed.

(*Id.* at 4:35:50-58.)  Kobe began to sob while telling the officers that he did not want to

be committed.  (*Id.* at 4:36:15-37:11.)  Kobe then abruptly stood up and ran into Officer

Holt, knocking off Officer Holt's body camera.  (*Id.* at 4:37:11.)  Officers Vu and Holt

both tried to grab Kobe, but he resisted.  (Doc. No. 21-10 ("Vu BWC") at 4:37:11-16.)

At this point, Officers Turner and Akers rushed into the house.  (Akers BWC at

4:37:13-19.)  Two officers[2] are heard yelling, "get down on the ground," as Kobe

continued to resist Officers Holt and Vu.  (Doc. No. 21-2 ("Turner BWC") at 4:37:12-

16.)  Officer Holt and Kobe then crashed into the couch, tipping the couch over.  (*Id.* at

4:37:12-19.)  Officer Holt rolled onto the floor near the front door while Kobe remained

on the tipped-over couch.  (*Id.* at 4:37:15-18.)  Kobe's right hand began to reach in

between the couch cushions.  (Akers BWC at 4:37:18.)  At the same time, an officer

yelled, "Get down on the ground," and Officers Akers and Turner began to tase Kobe.

(Turner BWC at 4:37:15-19.)  Kobe, however, did not appear to respond to the tasing.

---

[2]    From the video, it is unclear who is saying "get down on the ground."  For
purposes of this motion, it is not material which officers said the commands.

(*Id.*)  Instead, he grabbed something between the cushions and then stood up with a knife in his right hand.  (Akers BWC at 4:37:19-20.)  An officer again yelled, "Get down on the ground!"  (*Id.* at 4:37:18-20.)  Right as Kobe gets up, Officer Akers yelled, "What's he got, a knife?"  (*Id.* at 4:37:20-22.)

Kobe tried to run, but Officer Vu grabbed his ankle and he and Kobe fell to the ground.  (*Id.*)  While on the ground, Officer Vu remained holding onto Kobe and Officer Turner ran over to Kobe.  (*Id.* at 4:37:21-22.)  As Kobe tried to get up again, Officer Turner jumped back and yelled, "Knife!  Knife!  Knife!"  (*Id.* at 4:37:23-24.)  Officer Vu appears to let go of Kobe.  (*Id.*)  It is unclear exactly what Kobe is doing with the knife at this point.  Plaintiff argues that Kobe was only trying to stand up, with his knife turned downward, while Defendants assert that Kobe was making stabbing motions.  But neither party disputes that Kobe was moving with the knife in his hand.  (*See id.* at 4:37:23-25.)  His arm also appears to be raised at one point, although it is not entirely clear which way the knife is pointed.  (*Id.* at 4:37:24.)  Officer Turner and Officer Vu were within feet of Kobe as this happened.  (*Id.*)  Officer Turner then fired three shots.  (Turner BWC at 4:37:24-26.)  At the same time, Officer Akers fired multiple shots at Kobe.  (Akers BWC at 4:37:24-26.)  Kobe passed away before the officers were able to render aid.

The trustee of Kobe's estate, Amity Dimock, brought this action on behalf of Kobe against the City of Brooklyn Center and Officers Akers, Holt, Turner, and Vu, alleging six claims:  (1) excessive force; (2) deliberate indifference; (3) unlawful search; (4) violations of the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA"); (5) wrongful death; and (6) *Monell* liability.  Defendants now

6

move for summary judgment.  (Doc. No. 18.)  Plaintiff opposes the motion.  (Doc.
No. 24.)

## DISCUSSION

### I.     Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party opposing a motion for summary
judgment "may not rest upon mere allegation or denials of his pleading, but must set forth
specific facts showing that there is a genuine issue for trial."  *Id.* at 256.  "Conclusory
arguments, without evidence, are insufficient as a matter of law to establish a material
question of fact."  *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1019 (8th
Cir. 2017).  The Court views the evidence and all reasonable inferences in the light most
favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885,
892 (8th Cir. 2009).

### II.    Standing

As an initial matter, Defendants assert that Plaintiff only has standing to bring a
claim related to Kobe's death on behalf of Kobe as a trustee of his estate.  Thus,
Defendants argue, Plaintiff does not have standing to assert claims related to the
warrantless entry, pat-down search, or use of a taser because such acts did not result in
Kobe's death.

The Supreme Court has directed courts to look at state survivorship statutes to determine whether a claim under § 1983 abates on the death of a person. *Robertson v. Wegmann*, 436 U.S. 584, 589-90 (1978) (holding that under § 1988, state survivorship statutes "provide[] the principal reference point in determining survival of civil rights actions"). Under Minnesota law, a trustee may maintain an action for damages arising out of an injury, even if the injury is "unrelated to those injuries" that caused the person's death, so long as "the decedent might have maintained an action therefor had the decedent lived." Minn. Stat. § 573.02, subd. 2.

In this case, had Kobe survived, he could have brought an action under § 1983 related to the warrantless entry, pat-down search, and use of a taser. Therefore, Plaintiff has standing to bring these claims under § 1983 as trustee of Kobe's estate.

## III.   Qualified Immunity

Defendants assert that qualified immunity applies to each of Plaintiff's claims under § 1983. The doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To overcome the defense of qualified immunity, a plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted). The Court has discretion to decide which qualified immunity prong to consider first.

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In determining whether the

constitutional right was clearly established at the time of the conduct, the Court must ask

whether the contours of the applicable law were "'sufficiently clear' that every

'reasonable official would have understood that what he is doing violates that right.'"

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S.

635, 640 (1987)).  "When properly applied, qualified immunity protects all but the

plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, 575 U.S.

822, 825 (2015) (brackets and internal quotations omitted).

A.    **Warrantless Entry**

Plaintiff first asserts that Defendants violated Kobe's Fourth Amendment rights by

entering the home Kobe was residing in without a warrant.

"Absent consent or exigent circumstances, a private home may not be entered to

conduct a search or effect an arrest without a warrant." *Donovan v. Dewey*, 452 U.S.

594, 598 n.6 (1981).  Officers may enter a residence if they receive "voluntary consent to

enter from a person possessing authority over the residence." *United States v. Faler*,

832 F.3d 849, 853 (8th Cir. 2016).  Voluntary consent can be express or implied. *Id.*  In

determining whether a person gave implied consent, "the precise question is not whether

[the person] consented subjectively, but whether his conduct would have caused a

reasonable person to believe that he consented." *Id.* (internal quotations and citation

omitted).

In this case, Defendants argue that Erwin impliedly consented to the officers'

entry.  Video footage shows that Officer Akers told Erwin that they had to ensure that

9

everyone was alright.  (Akers BWC at 4:26:23-26.)  Erwin responded, "okay," and then

opened the front door and stepped inside.  (*Id.* at 4:26:26-38.)  He appeared to hold the

screen door open behind him.  (*Id.* at 4:26:36-38.)  The officers then followed Erwin

inside.  While Erwin said in his deposition that he did not want the officers to enter, the

Court looks at the individual's conduct rather than subjective feelings.  Moreover, as

Erwin stepped inside, he continued to talk with the officers and answer their questions,

and as Officer Akers stepped inside the home, Erwin took a step back, giving Officer

Akers space to enter.  (*Id.* at 4:26:34-45.)  The Court concludes that a reasonable person

would have believed that Erwin consented to the entry.

    This case is similar to *United States v. Rodriguez*, where an officer asked the

defendant if he could step into the house to ask a few questions.  834 F.3d 937, 939

(8th Cir. 2016).  The defendant "did not verbally respond to [the officer's] comments, but

immediately turned and entered the house."  *Id.* at 940.  The officer then "followed him

inside," and the defendant "did not say anything as they entered the house."  *Id.*  The

Eighth Circuit concluded that a reasonable officer could have interpreted the defendant's

actions "as an invitation to enter" because the defendant "did not try to close the front

door, or protest when [the two officers] followed him into the house."  *Id.* at 941.

Additionally, after the officer asked if he could step in, the defendant "immediately

opened the screen door wider with one hand, and walked inside with his back to the

officers."  *Id.*

    Here too, when the officers said they needed to make sure everyone was alright,

Erwin said "okay" and then immediately went into the house, holding the screen door

open for a moment behind him.  He kept the front door wide open, and as Officer Akers approached, Erwin took a few steps back to allow him to enter.

Plaintiff asserts that Erwin "appears surprised by Officer Akers entry." (Doc. No. 24 at 37.)  The Court does not believe this to be a fair characterization of the video. Even Erwin himself denies being surprised by the officers' entry.  (Doc. No. 21-5 ("Erwin Dep.") at 33-34.)  And seconds before, Erwin is heard telling Kobe and his wife that the officers "just want to make sure everything is okay" and thus acknowledging the fact that the officers were about to enter.  (Akers BWC at 4:26:37-40.)  Regardless, the Court does not find this fact to be material, as the Court considers a person's conduct rather than whether they consented subjectively.  Here, a reasonable officer would have believed, by Erwin's conduct, that Erwin was allowing them into the house.

Even if Erwin had not consented to the entry, the Court concludes that exigent circumstances justified the warrantless entry.  "Without a warrant, the police may enter a home in response to exigent circumstances." *Smith v. Kansas City, Mo. Police Dep't*, 586 F.3d 576, 580 (8th Cir. 2009).  The Eighth Circuit has held that exigent circumstances exist where officers reasonably believe that "an armed individual presents a danger to others or themselves." *United States v. Quarterman*, 877 F.3d 794, 798 (8th Cir. 2017).

In this case, the officers knew that Kobe had just threatened Erwin with a knife and hammer.  When the officers arrived at the house, Erwin told them that Kobe was in the house with Susan, Kobe's grandmother.  When Officer Akers asked him what was going on, Erwin said, "he's going to be okay."  (Akers BWC at 4:26:15-19.)  At that time,

the officers had reason to believe that Kobe still presented a threat to others and that his grandmother was in the house with him. *See Burke v. Sullivan*, 677 F.3d 367, 372 (8th Cir. 2012) (concluding that officers were entitled to qualified immunity because "the officers had specific information [that] a potential victim, Burke, was inside the home with Jay, the violent suspect, whose erratic behavior generated the domestic disturbance call").

Plaintiff asserts that "Officer Turner could see Kobe seated on the sofa inside the house as shown by his statement that he (Kobe) could hear them through the open window." (Doc. No. 24 at 40.) Thus, Plaintiff argues that the officers could see that everything was fine. Officer Turner stated in both his deposition and BCA interview that he could not clearly see or hear what was going on in the house. (Turner Dep. at 36; Doc. No. 21-19 at 5.) Officer Turner stated that while he saw Kobe sitting on the couch, he could not hear what he was saying or see who he was talking to. (*Id.*) The fact that Officer Turner saw Kobe in the house does not eliminate the exigent circumstances because Officer Turner did not know if Kobe was armed, what he was saying, or who he was talking to.

Plaintiff also argues that if the Court were to find exigent circumstances in this case, then officers could enter a home anytime there is a domestic violence suspect "in a home which contains a hammer or a knife." (Doc. No. 24 at 41.) Plaintiff's argument, however, misses the mark. The mere "presence of a weapon in a home does not necessarily constitute exigent circumstances." *Quarterman*, 877 F.3d at 798. But here the officers knew that Kobe had threatened Erwin while holding a knife and a hammer

12

and that he was still in the house with Susan.  Given these facts, the officers were objectively reasonable in believing that Kobe posed a danger to others in the home.  *See id.* (concluding that exigent circumstances existed where defendant was carrying a gun while "evicting his girlfriend and getting in her mother's face").  While Erwin assured the officers that Kobe was "going to be okay" (Akers BWC at 4:26:15-19), the statement was vague and failed to address the severity of the situation.  Moreover, "an officer need not take a putative victim's statement at face value when assessing whether a suspect presents an ongoing threat to the victim."  *Cotton v. Miller*, 74 F.4th. 932, 935 (8th Cir. 2023).  The Court concludes that the officers had a reasonable basis to believe that exigent circumstances existed.

Overall, viewing the facts in the light most favorable to Plaintiff, Plaintiff has failed to demonstrate a violation of a clearly established right regarding the warrantless entry.  Thus, Defendants are entitled to qualified immunity on this claim.

**B.     Pat-Down Search**

Plaintiff additionally claims that Officers Holt and Vu conducted an unlawful pat-down search of Kobe.  An officer may conduct "a limited, warrantless search for the protection of himself or others nearby in order to discover weapons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous." *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002).  The officers here were responding to a call that Kobe threatened Erwin with a hammer and knife.  While Erwin told the officers that Kobe gave him his weapons, it was reasonable for the officers to

believe that Kobe may still be armed.  The officers were thus justified in making a limited search.

The Court therefore concludes that Defendants are entitled to qualified immunity and this claim is dismissed.

### C.    Excessive Force

Plaintiff next alleges that the officers used excessive force and has two main bases for this claim.  First, she alleges that Defendants repeatedly used Tasers "to inflict pain on [Kobe] without warning or orders to comply."  (Doc. No. 1 ("Compl.") ¶ 82.)  Second, Plaintiff alleges that Officer Turner's and Officer Akers's use of deadly force was unreasonable.  (*Id.* ¶ 85.)

The Court will first address the officers' use of Tasers.  Plaintiff asserts that "Officers Turner and Akers tased Kobe without warning or orders."  (Doc. No. 24 at 49.)  Under the Fourth Amendment, officers are prohibited from using unreasonable, or excessive, force in effectuating a seizure.  *Cole Est. of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020).  When determining whether a use of force is unreasonable, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The Court considers "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest."  *Id.*  The

Court judges the reasonableness of the force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Here, Kobe was suspected of committing a crime. Kobe abruptly got out of his chair and attempted to flee from Officers Holt and Vu. The officers tried to stop Kobe, resulting in Kobe and Officer Holt toppling over the couch. Kobe continued to resist and was told three times to, "get down on the ground," before Officer Akers and Officer Turner tased him. (Turner BWC at 4:37:12-19.) Kobe did not listen to the commands and continued to attempt to flee. The Eighth Circuit has found it reasonable to use a Taser when a suspect flees from police or tries to resist arrest. *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (concluding that the use of a Taser was reasonable when there is "an active attempt to evade arrest by flight"). The Court concludes that the officers' use of Tasers was reasonable.

Plaintiff also asserts that Officers Akers's and Turner's use of deadly force was unreasonable. "[A]bsent probable cause for an officer to believe the suspect poses an immediate threat of death or serious bodily injury to others, use of deadly force is not objectively reasonable." *Cole Est. of Richards*, 959 F.3d at 1132 (internal quotations and citation omitted). The mere presence of a weapon "is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the [weapon] at another individual or take similar menacing action." *Id.* (internal quotations and citation omitted). The threat also must "be reasonably perceived as immediate." *Id.* "[I]f the threat has passed, so too has the justification for the use of deadly force." *Id.*

15

In this case, Kobe was fleeing from the officers when he reached in between the couch cushions to pull out a knife. (Akers BWC at 4:37:18.) Kobe did not react to being tased and did not respond to the officers' multiple commands to "get down on the ground." (Turner BWC at 4:37:12-19.) As Kobe got up from the couch and tried to run with the knife in his hand, Officer Akers noticed the knife and said, "What's he got, a knife?" (Akers BWC at 4:37:20-22.) Officer Turner ran over to Kobe and noticed the knife at that point. (*Id.* at 4:37:21-24.) With the knife in his hand, Kobe started to get up from the ground, and Officer Turner and Vu were within feet of him. (*Id.* at 4:37:23-25.) At that point, Officers Turner and Akers shot Kobe.

Plaintiff argues that Kobe was not a threat to the officers because Kobe was merely trying to get up and did not make any slashing motion towards the officers. Whether Kobe made slashing motions with the knife is a disputed fact here. None of the video footage shows this moment clearly. It is undisputed, however, that Kobe began to move with the knife in his hand. It is also undisputed that, seconds before this, Kobe attempted to flee from the officers, resisted their attempts to stop him, and then armed himself with a knife in the process. Kobe was within feet of Officers Turner and Vu. And the knife was red, which led Officer Akers to reasonably believe that the knife was covered in blood. (Doc. No. 21-13 ("Akers Dep.") at 38.) From when the officers noticed the knife to when Kobe began to get up with the knife in his hand, the officers had mere seconds to assess what Kobe was doing. (*See* Akers BWC at 4:37:21-25.)

While it could be that Kobe did not intend to use the knife and was only trying to stand up, that is not the ultimate inquiry here. Rather, "[r]easonableness must be

determined from the point of view of a reasonable officer in the situation." *Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993). "An erroneous perception or belief does not violate the Fourth Amendment if such perception or belief is objectively reasonable." *Id*. Given the totality of the circumstances here, Officer Turner's and Officer Akers's belief that Kobe posed an imminent threat of death or serious bodily injury was reasonable.

The fact that Kobe may not have pointed the knife towards an officer also does not change the Court's conclusion here. "An officer does not have to wait until a weapon is pointed at him to use deadly force as a protective measure." *Loch v. City of Litchfield*, 837 F. Supp. 2d 1032, 1041 (D. Minn. 2011) (citing *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)). As noted above, Officers Turner and Akers knew that Kobe had stabbed himself with a knife earlier that year, threatened his grandfather with a knife and hammer that day, attempted to flee from the officers, resisted the officers' attempt to stop him, had not responded to being tased, and armed himself with a knife in the process. At that point, Kobe was within feet of Officers Turner and Vu and began to move with the red knife in his hand. Officers Turner and Akers had to make a "split-second judgment" in a "tense, uncertain, and rapidly evolving situation." *Aipperspach v. McInerney*, 766 F.3d 803, 806 (8th Cir. 2014) (internal quotations and citation omitted). While Plaintiff may now argue "in the calm aftermath, that [the officers] could have taken a different course, . . . [the Court] do[es] not hold the police to such a demanding standard." *Id.* (internal quotations and citation omitted).

This case is similar to *Estate of Morgan v. Cook*, where the Eighth Circuit concluded that an officer was entitled to qualified immunity for using deadly force when

a person with a concealed knife "lifted his foot as if to take a step in the general direction of [the officer]."  686 F.3d 494, 497 (8th Cir. 2012.)  Similarly, Kobe had a knife in his hand and began to get up from the ground.  It is unclear exactly where Kobe was moving towards, but he was within feet of Officer Vu, who was on one side of him, Susan, who was directly in front of him, and Officer Turner, who was on the other side of him. Plaintiff argues that this case is distinguishable because the officer in *Estate of Morgan* told the person to drop the knife prior to using deadly force.  *See id.* at 496.  The Court disagrees.  The officers in this case told Kobe multiple times to "get down on the ground."  (Turner BWC at 4:37:12-:19.)  Moreover, the officer in *Estate of Morgan* was twelve feet from the armed person, while here Kobe was within feet of Officer Turner, Officer Vu, and Susan.  Kobe was already moving with the knife in his hand when Officer Turner and Officer Akers first discovered the knife, so a warning that deadly force was going to be used was not feasible.  *See id.* at 498 ("[B]ecause Cook was only six to twelve feet away from Morgan when Morgan moved toward Cook, Cook did not have time to utter a more specific warning ('Stop, or I'll shoot.') before firing.").  Moreover, Officer Akers and Turner did not shoot Kobe until he began to move with the knife.

This case is unlike the Minnesota case that Plaintiff cites where a woman called the police because her husband was intoxicated and attempting to drive away with multiple knives with him.  *Maras v. City of Brainerd*, 502 N.W.2d 69, 73 (Minn. Ct. App. 1993).  When the officer arrived, the man was in the car on his driveway.  *Id.*  The wife alleged that the officer ran "up the driveway with his gun ready."  *Id.*  Her husband then got out of the car with a knife in one hand and a beer in the other.  *Id.*  The office told the

man to put the knife down. *Id.* The man could barely stand and responded, "Let's party." *Id.* The man began to move slowly towards the officer and the officer shot him twice in the chest. *Id.* The wife stated that her husband was 14 feet away from the officer at the time of the shooting.[3] *Id.*

The Minnesota Court of Appeals concluded that the officer was not entitled to qualified immunity because the man "never raised the knife above his waist," "[n]one of the officers felt that [his wife] was in any danger," and the man "was obviously intoxicated and could barely stand." *Id.* at 77. This case is different in many respects. Unlike the man in *Maras*, Kobe was suspected of threatening someone with a knife. Also, unlike *Maras*, Kobe attempted to flee from police, resisted their attempts to stop him, and armed himself with a knife in the process. When the officers discovered the knife, Kobe was within feet of two officers and his grandmother, and the officers reasonably believed that Kobe was going to use the knife to harm one of them.[4]

---

[3]     Plaintiff states that the man in *Maras* was shot "at a range of 5-6 feet," however, that was a disputed fact in the case. (Doc. No. 24 at 49.) There was no video footage of the shooting. The wife maintained that the man was 14 feet away from the officer when he was shot, and the court was required to view the facts in the light most favorable to the plaintiff.

[4]     Plaintiff also asserts that "Kobe's status as an autistic person is material to whether the use of deadly force upon him was reasonable." (Doc. No. 24 at 47.) Additionally, Kobe was known to be suicidal. But the Eighth Circuit has held that "mental illness . . . does not reduce the immediate and significant threat a suspect poses." *Quinones v. City of Edina*, 77 F.4th 1192, 1996 (8th Cir. 2023). While Kobe was autistic and known to be suicidal, that did not reduce the threat he posed to the officers.

Based on the totality of the circumstances and viewing the facts in the light most favorable to Plaintiff, the Court concludes that both Officer Turner and Officer Akers had probable cause to believe that Kobe posed an immediate threat of death or serious bodily injury to others at that point, which justified their use of deadly force.  The Eighth Circuit has consistently held that deadly force is permissible in situations similar to this.  *See Est. of Morgan*, 686 F.3d at 497 (concluding that use of deadly force was reasonable when the suspect was holding a knife twelve feet from the officer and began to move toward the officer); *Swearingen v. Judd*, 930 F.3d 983, 988 (8th Cir. 2019) (concluding that an officer did not violate a clearly established right when he used deadly force after being "suddenly confronted" by a suspect with a knife, "at a distance of only three feet").  The Court therefore concludes that Officers Turner and Akers are entitled to qualified immunity.

## IV.    Other Claims

Plaintiff brings several additional claims, including deliberate indifference, *Monell*, wrongful death, and a claim under the ADA and the MHRA.  Plaintiff has not attempted to defend these claims.  When asked directly about these claims at the motion hearing, Plaintiff stated that she was abandoning her deliberate indifference and *Monell* claims and stated that she was "not in a position at this point to defend" the ADA/MHRA claim.  *See Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) (concluding that by not opposing the motion for summary judgment on certain claims, the plaintiff waived the claims).  The Court grants Defendants' summary judgment related to these claims.

## CONCLUSION

This ruling in no way minimizes the loss that Kobe's family has experienced. This is a truly tragic situation. But for the reasons outlined above, the Court grants Defendants' motion for summary judgment.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (Doc. No. [18]) is **GRANTED**. Plaintiff's claims against Defendants (Doc. No. [1]) are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 7, 2024                    s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge

21